[Cite as *State v. M.T.-R.*, 2024-Ohio-3010.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

     Plaintiff-Appellee,          :

                       No. 113235

     v.                          :

M. T.-R.,                                   :

     Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 8, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-676392-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nora Bryan, Assistant Prosecuting Attorney, *for appellee*.

D.W. Smith Legal Services and Derek W. Smith, *for appellant*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant ("Appellant")[1] appeals his convictions and claims the following errors:

1. The verdicts were unconstitutional, in violation of appellant's right to due process under the Ohio and U.S. Constitutions because they are based on evidence that is insufficient. Conviction based only upon the uncorroborated testimony of an alleged victim about an alleged incident which occurred many years ago is constitutionally insufficient to sustain a conviction when the testimony is contradictory, vague, insubstantial, and inherently improbable.

2. The verdicts were based on insufficient evidence as a matter of law and against the manifest weight of the evidence.

3. The trial court prejudiced appellant to an unfair trial by failing to bifurcate the trial into two separate and distinct trials with regard to each victim.

{¶ 2} We affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} Appellant was charged with one count of gross sexual imposition in violation of R.C. 2907.05(A)(1) with a sexually violent predator specification (Count 1); one count of kidnapping in violation of R.C. 2905.01(A)(4) with sexual-motivation and sexually violent predator specifications (Count 2); two counts of rape in violation of R.C. 2907.02(A)(2) with sexually violent predator specifications (Counts 3-4); one count of sexual battery in violation of R.C. 2907.03(A)(5) with a sexually violent predator specification (Count 5); and four counts of gross sexual imposition in violation of R.C. 2907.05(A)(1) (Counts 6-9). The counts were

---

[1] Pursuant to Loc.App.R. 13.2(B)(1), we refer to the appellant and victims by initials and generic terms to protect the victims' privacy.

subsequently amended to remove the sexual-motivation and sexually violent predator specifications. (Tr. 928.)

{¶ 4} Counts 1 and 2 were allegedly committed against S.B., and Counts 3-9 were allegedly committed against D.L. D.L. testified at trial that she and her family moved from Puerto Rico to Cleveland, Ohio in 2012. D.L.'s stepfather, Appellant, obtained a job in the Cleveland area, and D.L.'s mother thought they would have a better life in Ohio than in Puerto Rico.

{¶ 5} Appellant moved before the rest of the family, and the family joined him in Ohio in March 2012 when D.L. was 15 years old. D.L. testified that although she shared a bedroom with her sister ("Sister"), Appellant woke her (D.L.) up for school before anyone else in the house was awake. According to D.L., Appellant would put his hands down her pants as they walked down the stairs. (Tr. 423-324.) She explained that Appellant would "open the lips of my vagina, but he w[ould] never insert his hand inside." (Tr. 425-426.) D.L. did not tell anyone what Appellant was doing because he told her nobody would believe her. (Tr. 427.) D.L. did not have a good relationship with her mother ("Mother") and, therefore, concluded that because she could not stop Appellant, "[t]he only option was to get out of that house." (Tr. 436.)

{¶ 6} In October 2012, D.L. started dating a teenage boy at her school. Shortly thereafter, she became pregnant and moved into her boyfriend's home in February or March 2013. (Tr. 436.) D.L. moved home to live with Appellant and Mother after the baby was born because the baby was born prematurely, and D.L.

needed help caring for him. (Tr. 440.) When the baby was one year old, D.L. moved back in with her boyfriend's family, and she became pregnant with her second child. D.L. separated from her children's father when she was 17 years old and once again moved home with Appellant, her mother, and her siblings. (Tr. 440.)

{¶ 7} In July or August 2015, when D.L. was 18 years old, she asked Appellant to help her pay her cell phone bill. At the time, D.L. was home alone with Appellant and her two children. (Tr. 445.) D.L.'s son was two years old and her daughter was an infant. D.L. testified that Appellant put a condom on, pushed her back onto the bed on which she was sitting, climbed on top of her, and penetrated her vagina with his penis. (Tr. 511.) When he was finished, Appellant gave D.L. some money and said, "Here. You can pay for your phone." (Tr. 445, 449.) D.L. testified that prior to the rape, she told Appellant "no," but he did not listen. (Tr. 451.)

{¶ 8} D.L. explained that she would have resisted if she had the same "mentality" in 2015, when the rape occurred, that she had at the time of trial in 2023. When asked why D.L. did not resist Appellant, she replied, "It was very simple. I was gonna be on the streets." (Tr. 613.) D.L. did not tell anyone about this incident because she was afraid no one would believe her. D.L. testified that her mother never taught her or her siblings about sexual assault or the difference between good and bad touching. (Tr. 490, 611.)

{¶ 9} In March 2022, D.L. was no longer living with Mother and Appellant. She also had a third child, S.B. On March 10, 2022, D.L. dropped her three children off at Appellant's house because she had to go to work and her friend, who normally

babysat the children, was in Puerto Rico. After D.L. returned and took the children home, S.B. told her, "Mommy it hurts here." (Tr. 464.) D.L.'s son, A.E., disclosed that Appellant touched S.B.'s "middle spot." (Tr. 473-474 and 625.) A.E. who was ten years old at the time of trial, testified at trial, "I saw Papa touching the middle spot of my little sister's . . ." (Tr. 621 and 627.) A.E. told D.L. in March 2022 and the jury at the time of trial that S.B.'s underwear was off and "[h]e was touching that middle spot." (Tr. 628.) As a result of S.B.'s complaints of pain and A.E.'s disclosure, D.L. took S.B. to the hospital for an examination. (Tr. 474.) D.L. did not allow Appellant or Mother to see S.B. again after this incident. (Tr. 475.)

{¶ 10} Kayla Galton ("Galton"), a sexual assault nurse examiner ("SANE") at Lutheran Hospital, testified that she examined S.B. Galton observed redness and swelling in and around S.B.'s vagina. (Tr. 591.) Galton obtained swabs of S.B.'s external genitalia and outer thighs for DNA testing. D.L. told Galton that Appellant used to touch her own, her sister's, and her brother's genitalia. (Tr. 582.) D.L. told Galton that because their mother did not believe them when they told her about Appellant's abuse, they stopped telling her. (Tr. 598.)

{¶ 11} Following the SANE examination, S.B. and the family were referred to the Cuyahoga County Division of Children and Family Services for further investigation and support. Brittany Svoboda ("Svoboda"), a DNA analyst, performed DNA testing on the swabs taken during S.B.'s SANE examination. She testified that she found male DNA in the swabs taken from S.B.'s vagina, but there

was not enough material to generate a genetic profile for purposes of matching it with a suspect. (Tr.669-672.)

{¶ 12} Mother and Sister testified for the defense. Mother testified that she taught her children about sexual assaults and the difference between good and bad touching. (Tr. 775.) She denied that Appellant ever touched D.L. inappropriately and asserted that Appellant never woke D.L. up before everyone else for school. According to Mother, the children were always awakened at the same time. Sister testified that she shared a bedroom with D.L. when they first moved to Cleveland and stated that she and D.L. always woke up at the same time. (Tr. 797.) Sister further stated that their mother always woke them up and denied that Appellant ever woke them up in the morning. (Tr. 798.)

{¶ 13} However, on cross-examination, Mother admitted that she never worked outside the home, that Appellant always supported her financially, and that there would be serious financial ramifications for her if Appellant were convicted. (Tr. 777.) And Sister admitted on cross-examination that she was not always home during the relevant time period because she was "AWOL" from school and home. (Tr. 813-814.)

{¶ 14} At the close of the State's case in chief, Counts 8 and 9, two counts of gross sexual imposition with sexually violent predator specifications, were dismissed. At the conclusion of the trial, the jury found Appellant not guilty on Counts 1 and 2, the only two counts pertaining to S.B. However, the jury found Appellant guilty on the two rape charges alleged in Counts 3 and 4, the sexual battery

charge alleged in Count 5, and the two gross sexual imposition charges alleged in Counts 6 and 7.

{¶ 15} The State conceded at sentencing that Counts 4 and 5 merged for sentencing, and the State elected to proceed to sentencing on Count 4. The court sentenced Appellant to an indefinite prison term of ten to 15 years on Counts 3 and 4, and 18-month prison terms on Counts 6 and 7. The court ordered all prison terms to be served concurrently. The court also classified Appellant as a Tier III sex offender and gave him credit for time served. However, because the sentencing entry did not expressly state that Count 5 merged into Count 4, the trial court issued a nunc pro tunc journal entry clarifying that Count 5 merged with Count 4.

{¶ 16} Appellant now appeals his convictions.

## II. Law and Analysis

### A. Nunc Pro Tunc

{¶ 17} As a preliminary matter, we address the issue of whether the trial court was permitted to journalize a nunc pro tunc journal entry providing that Counts 4 and 5 merged for sentencing purposes. As previously stated, the original sentencing entry failed to state that Count 5 merged with Count 4 for sentencing purposes.

{¶ 18} In *Scaglione v. Saridakis*, 2009-Ohio-4702, (8th Dist.), we explained the proper use of a nunc pro tunc judgment entry as follows:

> "A nunc pro tunc order may be issued by a trial court, as an exercise of its inherent power, to make its record speak the truth. It is used to record that which the trial court did, but which has not been recorded. It is an order issued now, which has the same legal force and effect as if it had been issued at an earlier time, when it ought to have been issued.

> Thus, the office of a nunc pro tunc order is limited to memorializing what the trial court actually did at an earlier point in time. It can be used to supply information which existed but was not recorded, to correct mathematical calculations, and to correct typographical or clerical errors.
>
> A nunc pro tunc order cannot be used to supply omitted action, or to indicate what the court might or should have decided, or what the trial court intended to decide. Its proper use is limited to what the trial court actually did decide."

*Id.* at ¶ 9, quoting *State v. Greulich*, 61 Ohio App.3d 22, 24-25 (9th Dist. 1988);

{¶ 19} The State conceded at the sentencing hearing that Count 5 (sexual battery) merged with Count 4 (rape) for sentencing purposes, and it elected to proceed to sentencing on Count 4. (Tr. 919.) Although the trial court did not expressly state that it was merging Count 5 into Count 4, it showed its acceptance of the merger by sentencing Appellant on Count 4.

{¶ 20} The trial court failed to note the merger in the sentencing entry and subsequently corrected the oversight by issuing a nunc pro tunc journal entry. The nunc pro tunc journal entry was not used to supply action omitted by the court or to decide something new; it was issued to accurately reflect the court's action at the sentencing hearing. Therefore, the court properly used the nunc pro tunc journal entry to correct the sentencing entry to reflect what actually happened in open court.

## B. Sufficiency and Manifest Weight of the Evidence

{¶ 21} In the first assignment of error, Appellant argues his convictions are not supported by sufficient evidence because they are based on the uncorroborated testimony of an alleged victim about incidents that occurred many years earlier. In

the second assignment of error, Appellant argues his convictions are against the manifest weight of the evidence.

{¶ 22} Although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these issues together because they are closely related, while applying the distinct standards of review to Appellant's arguments. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 23} In reviewing a challenge to the sufficiency of evidence, we determine whether the evidence, if believed, would convince the average juror of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* Our review is not to determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390; *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). "The sufficiency of the evidence standard requires great deference to the trier of fact." *State v. Sylvester*, 2016-Ohio-5710, ¶ 3 (8th Dist.).

{¶ 24} In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence." *Thompkins* at 387. While

"sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, . . . weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 2007-Ohio-2202,¶ 25, citing *Thompkins* at 386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id*. The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983).

{¶ 25} Appellant was convicted of rape in Count 4, in violation of R.C. 2907.02(A)(2). Count 4 alleges that Appellant "penetrated [D.L.]'s vagina with side of hand." R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another."

{¶ 26} The State may establish vaginal rape by presenting evidence that the defendant penetrated the labia majora of the external female genitalia. This court

has held that "if the force of an object — like a finger — causes a victim's labia to spread, that is sufficient penetration to constitute 'sexual conduct' under the statute; it is not necessary for an object to penetrate into the vagina." *State v. Sanchez-Sanchez*, 2022-Ohio-4080, ¶ 125 (8th Dist.), citing *State v. Roan*, 2020-Ohio-5179, ¶ 20 (8th Dist.) ("'[E]vidence of slight penetration, entering the vulva or labia, is sufficient to support a rape conviction.'"), quoting *State v. Falkenstein*, 2004-Ohio-2561, ¶ 16 (8th Dist.). *See also State v. Woods,* 2024-Ohio-1053, ¶ 42 (8th Dist.) (same); *State v. Artis*, 2021-Ohio-2965, ¶ 97 ("[A]lthough perhaps medically imprecise — legally, the vagina begins at the external genitalia, not some deeper internal structure."); *State v. Mack*, 2023-Ohio-4374, ¶ 56 (11th Dist.), quoting *State v. Zamora*, 2023-Ohio-1847, ¶ 9 (12th Dist.) ("'[I]t is generally well established that penetration of the victim's "vaginal opening" has occurred where there was some forceful spreading of the external female genitalia, or vulva, which is comprised of lip-like folds of skin called the labia majora.'").

{¶ 27} D.L. testified that shortly after she moved to Cleveland in 2012, Appellant routinely woke her up for school before anyone else in the house was awake. While walking D.L. downstairs, Appellant would put his hand down her pants and rub her vagina. D.L. testified:

Q: Okay. And would he move it as his hand was on your vagina?

A: Yes, he moved his hand.

Q: Now, did his hand penetrate your — the lips of your vagina?

A: Well, he will open the lips of my vagina, but he will never insert his hand inside.

. . . .

Q: Okay. And you said this happened starting when you went to school, when you were 15, almost every day?

A: Correct.

(Tr. 425-426.)

{¶ 28} The force element of a rape offense "is established if it is shown that the rape victim's will was overcome by fear or duress; force need not be overt and physically brutal." *State v. Fowler*, 27 Ohio App.3d 149 (8th Dist. 1985), paragraph three of the syllabus. In *Fowler*, we held that a stepfather's position as an authority figure relative to his 14-year-old stepdaughter was sufficient to establish the force element of a rape offense. *Id*. at 154. Incidentally, the stepfather in *Fowler* told the victim not to tell anyone. *Id*.

{¶ 29} D.L. testified that Appellant told her not to tell anyone about his sexual conduct and that she complied out of "fear" because he was her stepfather. He also told her nobody would believe her. (Tr. 427.) Thus, there was evidence that Appellant forcibly penetrated the labia majora of D.L.'s external genitalia, albeit the force was subtle and psychological.

{¶ 30} Appellant was also convicted of sexual battery in violation of R.C. 2907.03(A)(5) in Count 5, and two counts of gross sexual imposition in violation of R.C. 2907.05(A)(1) in Counts 6 and 7. R.C. 2907.03(A)(5) governs sexual battery and provides that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when . . . [t]he offender is . . . a stepparent, or guardian, custodian, or person in loco parentis of the other person." As previously stated,

"sexual conduct" includes the penetration of an object or hand sufficient to cause a female victim's labia to spread. *Sanchez-Sanchez*, 2022-Ohio-4080, at ¶ 125.

{¶ 31} R.C. 2907.05(A)(1) governs gross sexual imposition and provides that "[n]o person shall have sexual contact with another, not the spouse of the offender . . .when . . . [t]he offender purposely compels the other person . . . to submit by force or threat of force." R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶ 32} Beginning in March 2012, Appellant woke D.L. up for school almost every morning. D.L. testified that after waking her up, he walked her down the stairs and rubbed her vagina. D.L. testified that "he [would] open the lips of my vagina, but he [would] never insert his hand inside." (Tr.425-426.) Therefore there is sufficient evidence to support all the elements of Appellant's rape conviction in Count 4, the sexual-battery conviction in Count 5, and at least the two gross sexual imposition counts set forth in Counts 6 and 7.

{¶ 33} Appellant nevertheless argues that D.L.'s testimony is not legally sufficient to support these convictions because her testimony is "physically impossible" and "inherently improbable." (Appellant's brief p. 10.) He argues her testimony is "contrary to human experience" because it claims that Appellant committed these acts "while she was walking down the stairs, every day for months and no one saw it happening because they were all supposedly sleeping every time

it happened." He also cites the testimony of Mother, who testified that she woke all the children up at the same time, and the testimony of Sister, who testified that she slept in the same room with D.L. and woke up with D.L. every morning. Appellant implies that this contradictory testimony renders D.L.'s testimony "improbable" and, therefore, legally insufficient.

{¶ 34} However, D.L.'s testimony that Appellant woke her up and rubbed her vagina every morning while everyone was asleep is not physically impossible. And the contradictory testimonies of Sister and Mother does not render her testimony legally insufficient. Appellant's argument goes to the witnesses' credibility, which, as we have said, is an issue separate and distinct from sufficiency of the evidence. *Thompkins*, 78 Ohio St.3d at 386 (Sufficiency and manifest weight of the evidence are distinct legal concepts.). And, as we have explained, D.L.'s testimony is legally sufficient to establish all the essential elements of the crimes alleged in Counts 4-7. We address the witnesses' credibility after our discussion of the sufficiency of the evidence.

{¶ 35} Appellant was also convicted of the rape offense set forth in Count 3, which alleges that Appellant forcibly raped D.L. in 2015, when she was 18 years old. Appellant does not dispute that he had sexual intercourse with D.L. He argues there was insufficient evidence of rape because there was no evidence of force or a threat of force because D.L. did not scream or physically resist Appellant's sexual conduct. He asserts the encounter "seemed to be consensual" and that because Appellant paid

D.L.'s cell phone bill in exchange for sexual intercourse, D.L.'s testimony supports a finding of prostitution rather than of rape.

{¶ 36} However, "Ohio Supreme Court case law demonstrates that the type and amount of force necessary to purposefully compel a victim to submit 'by force or threat of force' depends upon the victim and offender's relationship." *State v. Penland*, 2023-Ohio-806, ¶ 43 (8th Dist.), quoting *State v. Wine*, 2012-Ohio-2837, ¶ 41 (3d Dist.). "'As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'" *Id.* at 59, quoting *Fowler*, 27 Ohio App.3d 149, 154, (8th Dist. 1985). Indeed, the rape statute itself does not require that a victim resist in order to prove that a defendant's act was forceful. *See* R.C. 2907.02(C) ("A victim need not prove physical resistance to the offender in prosecutions under this section.").

{¶ 37} D.L. testified that she objected to Appellant's sexual conduct and that she told him "no," but he did not listen. (Tr. 451.) Instead, he pushed her onto her back and "hopped on top" of her. (Tr. 446.) Evidence that Appellant pushed her onto her back while D.L. was objecting is evidence of force.

{¶ 38} There was also evidence that Appellant was D.L.'s stepfather, that she needed his financial support, and that he had sexually abused her when she was 15 years old. D.L.'s relationship with Appellant was one of dependence, which conferred substantial power to Appellant relative to D.L. When D.L. was asked whether she felt she could resist Appellant's conduct, she explained that she would have resisted if she had the same "mentality" in 2015, when the rape occurred, that

she had at the time of trial in 2023. And when asked why D.L. did not physically fight Appellant, she replied, "It was very simple. I was gonna be on the streets." (Tr. 613.) Therefore, despite Appellant's argument to the contrary, there was evidence of force sufficient to support the rape conviction alleged in Count 3.

{¶ 39} Having determined that there was sufficient evidence to support all of Appellant's convictions, we now turn to the weight of the evidence. Appellant maintains that D.L.'s testimony is not plausible because no one would believe that Appellant actually woke her up and rubbed her vagina every morning while her mother, sister, and brother were still sleeping. However, D.L.'s testimony that Appellant assaulted her "every day" need not be taken literally. It could also mean that he assaulted her often and it seemed as if it happened every day. Either scenario is possible.

{¶ 40} Nevertheless, Appellant argues that D.L.'s testimony lacks credibility because it conflicts with the testimonies of both Mother and Sister. However, D.L., a single mother, risked losing her relationship with her family by testifying against Appellant. The jury could reasonably conclude that D.L. must have had a good reason for taking such a risk.

{¶ 41} In addition, Mother's and Sister's testimonies were the only evidence contradicting D.L.'s testimony. Yet, Mother's testimony revealed that she had a reason to lie to protect Appellant. She admitted on cross-examination that she did not work, that she depended on Appellant financially, and that she would suffer serious financial ramifications if he were convicted.

{¶ 42} As previously stated, D.L.'s accusations and testimony against Appellant alienated her from her Mother. Sister was forced to choose between allegiance to her Mother or her sister. The jury could reasonably infer that Sister supported Mother by testifying in support of Appellant because she did not want to be estranged from Mother and the rest of the family. And, in any case, Sister admitted that she was not home every morning when Appellant was waking D.L. because she was with her boyfriend rather than at home or school. (Tr. 813.) Therefore, by her own admission, Sister may have been untruthful when she testified that she was present when Mother woke her and D.L. up every morning.

{¶ 43} Mother's and Sister's testimonies showed bias in favor of Appellant, and inconsistencies in Sister's testimony rendered it incredulous. By contrast, D.L. testified against Appellant at great cost. It was reasonable for the jury to believe D.L. and disbelieve Mother and Sister under these circumstances. Therefore, this is not a case where the jury clearly lost its way and created such a manifest miscarriage of justice that Appellant's convictions must be reversed and a new trial ordered.

{¶ 44} Accordingly, the first and second assignments of error are overruled.

## C. Bifurcation

{¶ 45} In the third assignment of error, Appellant argues his right to a fair trial was prejudiced because the trial court failed to try the counts involving S.B. in a separate trial from the counts involving D.L. He contends he was unfairly prejudiced by having the counts against two different victims tried together. However, because Appellant failed to object to the joinder of the counts in the trial

court, he forfeited all but plain error.  *State v. Davner*, 2017-Ohio-8862, ¶ 36, fn. 6 (8th Dist.) ("An issue not raised in the trial court forfeits all but plain error.").

{¶ 46} Crim.R. 52(B) authorizes appellate courts to correct "'[p]lain errors or defects affecting substantial rights' notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court."  *State v. Rogers*, 2015-Ohio-2459, ¶ 22, quoting Crim.R. 52(B).  To prevail under a plain-error analysis, the appellant bears the burden of demonstrating that, but for the error, the outcome of the trial would clearly have been different.  *State v. Payne*, 2007-Ohio-4642, ¶ 17.

{¶ 47} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, . . . or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."  Indeed, "'[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character.'"  *State v. Lott*, 51 Ohio St.3d 160, 163 (1990), quoting Crim.R. 8.  *See also State v. Dean*, 2015-Ohio-4347, ¶ 59.

{¶ 48} However, if it appears that a defendant would be prejudiced by the joinder, a trial court may grant a severance pursuant to Crim.R. 14.  *State v. Diar*, 2008-Ohio-6266, ¶ 94.  To prevail on a claim that the trial court erred in denying a motion for severance, the defendant must affirmatively demonstrate that (1) his rights were prejudiced; (2) at the time of the motion to sever, he provided the trial court with sufficient information so that it could weigh the considerations favoring

joinder against the defendant's right to a fair trial; and (3) given the information provided to the court, it abused its discretion in refusing to separate the charges for trial. *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992), citing *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus.

{¶ 49} The State may rebut a defendant's claim of prejudicial joinder in two ways. First, a defendant is not prejudiced by joinder if the evidence would have come in as other acts evidence under Evid.R. 404(B). *Lott* at 163. Under the second method, the State is not required to meet the stricter "other acts" admissibility test, but is simply required to show that evidence of each crime joined at trial is simple and direct. *Id.*, citing *State v. Roberts*, 62 Ohio St.2d 170, 175 (1980). Thus, a defendant is not prejudiced by joinder where the joined offenses are "'simple and direct, so that a jury is capable of segregating the proof required for each offense.'" *State v. Ferrell*, 2014-Ohio-4377, ¶ 39 (8th Dist.), quoting *State v. Fletcher*, 2004-Ohio-4517, ¶ 41 (2d Dist.). *See also Lott* at 163.

{¶ 50} The State presented separate and distinct evidence to establish Appellant's guilt as to each offense. D.L. testified that Appellant routinely woke her up and rubbed her vagina in the mornings before school in 2012, when she was 15 years old. She also stated that he raped her in 2015, before S.B. was born, when she asked Appellant to help her pay her cell phone bill. The charges involving S.B. alleged that Appellant sexually assaulted her in 2022, while D.L. was at work. The offenses against each victim clearly occurred at different times and under different circumstances. Therefore, there was no danger that the jury would confuse them.

**{¶ 51}** Further, joinder was appropriate because the charges pertaining to both victims were of similar character and were arguably part of an ongoing course of criminal conduct involving sex offenses against family members. Therefore, Appellant cannot demonstrate that he was unfairly prejudiced by the joinder.

**{¶ 52}** The third assignment of error is overruled.

**{¶ 53}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
ANITA LASTER MAYS, J., CONCUR