[Cite as *State v. Blackwell*, 2025-Ohio-1451.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                 :

                                     No. 114129

    v.                                              :

MALIK BLACKWELL,                                :

    Defendant-Appellant.              :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 24, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-682217-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristin M. Karkutt, Assistant Prosecuting Attorney, *for appellee.*

Edward F. Borkowski, Jr., *for appellant.*

LISA B. FORBES, P.J.:

{¶ 1} Malik Blackwell ("Blackwell") appeals his convictions for aggravated murder and having weapons while under disability ("HWWUD"). Blackwell also challenges the court's denial of his motion to sever and try separately certain counts. For the following reasons, we affirm the trial court's judgment.

## I. Factual Background and Procedural History

{¶ 2} In connection with the January 23, 2023 homicide of Tim Nash ("Nash") and April 7, 2023 homicide of Anthony Norman ("Norman"), a grand jury indicted Blackwell and codefendant Christopher Thompson ("Thompson") on June 21, 2023.

{¶ 3} Related to the killing of Nash, Blackwell was charged with Count 1, aggravated murder, an unclassified felony, in violation of R.C. 2903.01(A), with one- and three-year firearm specifications and a 54-month firearm specification; Count 2, murder, an unclassified felony, in violation of R.C. 2903.02(A), with one- and three-year firearm specifications and a 54-month firearm specification, a notice-of-prior-conviction ("NPC"), and repeat-violent-offender specification ("RVOS"); Count 3, murder, an unclassified felony, in violation of 2903.02(B), with one- and three-year firearm specifications and a 54-month firearm specification, a NPC, and RVOS; Count 4 felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1), with one- and three-year firearm specifications and a 54-month firearm specification, a NPC, and RVOS; Count 5, felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications and a 54-month firearm specification, a NPC, and RVOS; and Count 6, HWWUD, a felony of the third degree, in violation of R.C. 2923.12(A)(2).

{¶ 4} Related to the killing of Norman, Blackwell was charged with Count 7, aggravated murder, an unclassified felony, in violation of R.C. 2903.01(A), with one- and three-year firearm specifications and a 54-month firearm specification, a

NPC, and RVOS; Count 8, murder, an unclassified felony, in violation of R.C. 2903.02(A), with one- and three-year firearm specifications and a 54-month firearm specification, a NPC, and RVOS; Count 9, murder, an unclassified felony, in violation of 2903.02(B), with one- and three-year firearm specifications and a 54-month firearm specification, a NPC, and RVOS; Count 10, felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1), with one- and three-year firearm specifications and a 54-month firearm specification, a NPC, and RVOS; Count 11, felonious assault, a felony in the second degree, in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications and a 54-month firearm specification, a NPC, and RVOS; and Count 12, HWWUD, a felony of the third degree, in violation of R.C. 2923.12(A)(2).

{¶ 5} On June 3, 2024, the case proceeded to trial. Blackwell tried to the bench the HWWUD charges and firearm specifications except for the one- and three-year firearm specifications. All remaining charges were tried to a jury.

{¶ 6} On June 14, 2024, the jury found Blackwell guilty on all counts and specifications. The court found Blackwell guilty of the remaining counts and specifications.

{¶ 7} The court merged Counts 1 through 5 and Counts 7 through 11 for purposes of sentencing. On Count 1, the court imposed a prison sentence of 54 months for the firearm specification consecutive to a life sentence, with parole eligibility after 25 years. The court also imposed a 54-month firearm specification from Count 2, to run consecutively to the 54-month firearm specification in Count

1. On Count 7, the court imposed a prison sentence of 54 months for the firearm specification consecutive to a life sentence, with parole eligibility after 25 years. The court imposed an additional 54-month firearm specification from Count 8, to run consecutively to the 54-month firearm specification in Count 7. On Counts 6 and 12, the court imposed 36-month sentences, to be served concurrently to all other sentences and each other. Blackwell's aggregate prison sentence was life, with parole eligibility after 68 years.

{¶ 8} Blackwell appeals, raising the following assignments of error:

I. The trial court abused its discretion by denying Appellant's request for relief from prejudicial joinder.

II. Appellant's convictions are against the manifest weight of the evidence.

## II. Trial Testimony

### A. Tania Bryant

{¶ 9} Tania Bryant ("Bryant") stated that on January 23, 2023, Blackwell, Nash, and Rashena Horne ("Horne") helped her move out of her mother's residence at E. 61st Street. Bryant testified that Blackwell is her brother and that Nash was a handyman from her neighborhood whom she had known for between five and six years. She stated that in the months prior to January 23, 2023, she and Blackwell had "a small issue; nothing major" in their relationship, which had been resolved.

{¶ 10} At one point, Bryant and Horne left the house in a red Dodge Journey to buy marijuana. Bryant testified that Blackwell and Nash were the only people at the house when she and Horne left. Bryant estimated that they were gone for

between six and ten minutes.  When they returned, Nash was "laying on his stomach" on the floor, and Bryant "didn't know if he was alive or not."  Bryant called 9-1-1 and was instructed to roll Nash onto his back, which she did.

{¶ 11}  Bryant testified that, when police arrived, she consented to a search of her phone, which could access footage recorded by a camera installed at the front door of the E. 61st Street house.  Bryant stated that she did not remove any bullet casings from the house or did not remember doing so.

{¶ 12}  On cross-examination, Bryant agreed that Blackwell and Nash first met on January 23, 2023.  Bryant admitted that Nash was addicted to and regularly used crack cocaine.  Bryant admitted that Nash was high on the night that he was killed.  Bryant stated that Nash was "acting a little off," and "just kind of a little aggressive," but that he and Blackwell were getting along at the beginning of their meeting.

## B. Rashena Horne

{¶ 13}  Horne testified that Bryant is "one of my best friends."  On the night of January 23, 2023, Horne and Bryant left the E. 61st Street house to buy marijuana.  At that time, Blackwell and Nash were the only people at the house.  Before Horne and Bryant left, there had been no problems between them, Nash, or Blackwell.  After between 15 and 25 minutes, Horne and Bryant returned to the house at E. 61st Street, finding Nash lying face down on the living room floor.  Blackwell was no longer present.  Horne testified that Bryant called 9-1-1 and was instructed to turn Nash over on his back, which she did.  Horne testified that she did

not see any bullet casings on the living room floor, did not take anything from the living room, and did not see Bryant take anything from the living room.

### D. Johnathan Sanchez

{¶ 14} Johnathan Sanchez ("Sanchez") testified that he is a patrolman employed by the Cleveland Division of Police. On the night of January 23, 2023, Sanchez responded to a radio dispatch regarding an unconscious male at the E. 61st Street house. Sanchez testified that he spoke with Bryant, entered the house, and took photographs of the scene. While investigating the house, Sanchez and his partner located a shell casing in the living room. Sanchez reviewed doorbell-camera footage that showed Nash and Blackwell walking into the E. 61st Street house. Sanchez testified, "They looked like they were having some kind of back and forth type of argument." Sanchez stated that the doorbell-camera footage did not show Blackwell leaving the house. Sanchez searched the house and did not find Blackwell.

{¶ 15} On cross-examination, Sanchez stated that he "couldn't really make out what exactly was going on," in audio from the camera footage, but that Nash and Blackwell "were being a little louder than normal."

### E. Daniel Galita

{¶ 16} Dr. Daniel Galita ("Galita") testified that he is a forensic pathologist at the Cuyahoga County Medical Examiner's Office. Galita performed an autopsy on Nash. Galita testified that Nash was 60 years old, weighed 142 pounds, and was 73 inches tall. Galita identified ten gunshot wounds while examining Nash's body. According to Galita, seven of the ten gunshot wounds could have been fatal on their

own.  The path of travel of four of the ten gunshot wounds indicated the bullets traveled through Nash's body from back to front.  Four of the gunshot wounds that traveled front to back did so with a downward trajectory.

{¶ 17} Galita testified that, during the autopsy, fluid samples from Nash's body were submitted to the medical examiner's toxicology department for analysis. Galita reviewed the resulting toxicology report, which identified cocaine, cocaine metabolites, and ethanol in Nash's body.  Galita testified that these substances would have made Nash "agitated, very active."  Galita did not identify any other injuries such as scrapes, abrasions, bruises, or contusions on Nash's body that would indicate a violent struggle preceded the shooting.

### F. Orlando Velazquez

{¶ 18} Orlando Velazquez ("Velazquez") testified that he is a detective for the City of Cleveland and that he responded to the E. 61st Street house on January 23, 2023, to investigate Nash's homicide.  Velazquez stated that he collected three bullet casings from the house and took photos of the scene.  Velazquez agreed on cross-examination that some of these photos depicted a beer can lying on its side, a lamp sitting upright on the ground, and some garbage lying on the ground.

### G. Thomas Lascko

{¶ 19} Thomas Lascko ("Lascko") testified that he is a detective for the City of Cleveland.  Pursuant to a search warrant, Lascko took photos of the interior and exterior of an apartment associated with Blackwell on Lake Shore Boulevard. During this search, Cleveland homicide detectives seized several cell phones.

**H. Lisa Przepyszny**

{¶ 20} Lisa Przepyszny ("Przepyszny") testified that she is a forensic scientist with the Trace Evidence Department of the Cuyahoga County Medical Examiner's office. Przepyszny examined trace evidence regarding Nash's murder, including gunshot residue, nitrates, and powder grains around bullet defects in Nash's body. Przepyszny stated that, from this analysis, she determined Nash was shot from both an intermediate range, meaning from between one and four to five feet, and from a distant range, meaning more than five feet.

**I. Vesna Piscitello**

{¶ 21} Vesna Piscitello ("Piscitello") testified that she is a civilian analyst for the City of Cleveland's real-time crime center and that she assisted detectives in locating videos from the E. 61st Street area related to Nash's homicide. Piscitello reviewed real-time crime center camera footage in search of an individual on foot wearing a dark sweatshirt with white writing and distressed jeans. She stated that, in a video recorded near E. 55th Street and E. 42nd Street on January 23, 2023, she observed an individual that matched this description walking westbound between approximately 11:24 p.m. and 11:43 p.m. This individual also appeared to be wearing a red coat. Piscitello also located a red Dodge vehicle facing eastbound on E. 55th Street. Bryant had informed Cleveland Police that she drove a vehicle

matching this description when she left the E. 61st Street house to purchase marijuana.

{¶ 22} Piscitello also helped detectives locate video regarding Norman's homicide. This footage depicted a black Nissan traveling on various streets near 4913 Anson Avenue between 5:24 p.m. and 8:51 p.m. — before and after the homicide — on April 7, 2023.

### J. Marissa Esterline

{¶ 23} Marissa Esterline ("Esterline") testified that she is a forensic scientist at the Cuyahoga County Regional Forensic Science Laboratory in the DNA Department. Esterline analyzed items submitted to the lab regarding the Nash homicide, including a bloodstain card, shell casings, and buccal swabs from Nash, Horne, Bryant, and Blackwell. Esterline stated that she found someone else's DNA under Nash's fingernails, but not enough for her to determine whose. Esterline also found DNA from a source other than Nash on Nash's right hand, but stated it did not belong to Blackwell, Horne, or Bryant.

{¶ 24} On cross-examination, Esterline admitted that different people shed DNA at different rates and that it is possible to touch a surface without transmitting enough DNA to detect.

### K. Tayvis Bias

{¶ 25} Tayvis Bias ("Bias") testified that he lives on E. 49th Street, near the Anson Avenue address at which Norman was killed. Bias testified that, around 8:30 p.m. on April 7, 2023, he observed a white SUV traveling in the wrong direction

down Anson Avenue. The vehicle pulled into an empty lot two or three lots down the street from Bias's address. Minutes later, Bias heard an initial gunshot, followed by a barrage of 14 or 15 shots.

{¶ 26} On cross-examination, Bias admitted that he was not looking out his windows when he heard the shots, so he could not identify who fired them.

**L. Russell May**

{¶ 27} Russell May ("May") testified that he is a patrol officer for the Cleveland Division of Police and that he responded to Anson Avenue the night of April 7, 2023, following a radio assignment that reported shots fired. After arriving at the scene, Officer May and his partner discovered a white GMC Terrain idling with its lights on. May observed Norman lying shot in a nearby driveway, exhibiting no signs of life. Norman was surrounded by multiple shell casings and bags May believed to contain drugs.

**M. Katelyn Duplega**

{¶ 28} Katelyn Duplega ("Duplega") testified that she is a crime-scene detective for the Cleveland Division of Police and that she responded to Anson Avenue on April 7, 2023. She testified that she took photographs and collected evidence at the scene. This evidence included 11 .45-caliber bullet casings and one 9 mm bullet casing.

**N. Shayna Gray**

{¶ 29} Shayna Gray ("Gray") testified that she is a forensic scientist in the Cuyahoga County Regional Forensic Science Laboratory's Trace Evidence

Department. Gray examined trace evidence regarding Norman's murder, including gunshot residue, nitrates, and powder grains around bullet defects in Norman's body. Gray stated that, from this analysis, she determined at least one bullet that hit Norman was fired from an intermediate distance, meaning from one to five feet away.

### O. Robert Klomfas

{¶ 30} Robert Klomfas ("Klomfas") testified that he is a Special Deputy U.S. Marshal. His duties in this role include tracking and arresting individuals wanted in connection with violent crime. In February 2023, Klomfas was assigned to locate Blackwell. On April 28, 2023, Klomfas visited a Woodland Avenue apartment, where he did not locate Blackwell but did find and confiscate his cell phone. On May 4, 2024, Klomfas helped arrest Blackwell, without incident, at an apartment on Lake Shore Boulevard. Klomfas identified the defendant in the courtroom as the person he helped arrest.

### P. Carey Baucher

{¶ 31} Carey Baucher ("Baucher") testified that she is a forensic scientist that analyzes DNA for the Cuyahoga County Regional Forensic Science Laboratory. Baucher analyzed items submitted to the lab regarding the Norman homicide, including a bloodstain card, shell casings, and buccal swabs from Norman and Thompson. Baucher testified that her DNA analysis of evidence found on or around Norman's body presented no statistical support for a match with Blackwell or Thompson.

**Q. Michael Asbury**

{¶ 32} Michael Asbury ("Asbury") testified that he is a detective for the Rocky River Police Department and that he has received extensive training regarding cell-phone records and location analysis. Asbury analyzed location data for three cell phones associated with Norman, Blackwell, and Thompson. The phones associated with Thompson and Blackwell called each other multiple times throughout the day of April 7, 2023. Some of these calls lasted for several minutes. Asbury testified that these phones traveled together beginning at 6:48 p.m. that night. At 7:10 p.m., Blackwell's phone received a call from Norman's, which lasted for 135 seconds. Blackwell's phone called Norman's again at 8:00 p.m. and again at 8:24 p.m.

{¶ 33} Blackwell's and Thompson's phones traveled to the crime scene together, where they were located along with Norman's device at 8:32 p.m. All three phones then moved away from the crime scene together. Norman's device stopped at a location north of the crime scene at 8:36 p.m. Blackwell's and Thompson's devices then exited Cuyahoga County to the east, before returning to Cuyahoga County and staying together until the early morning of April 8, 2023. The phones then parted ways but contacted one another throughout the morning.

**R. James Kooser**

{¶ 34} James Kooser ("Kooser") testified that he is a forensic scientist employed by Cuyahoga County Regional Forensic Science Laboratory, specializing in firearms and tool marks. Kooser testified that each firearm, when fired, leaves

unique, microscopic impressions on spent shell casings. Kooser analyzed these impressions on the .45-caliber shell casings collected from both crime scenes in this case. Based on this analysis, Kooser determined the same .45-caliber firearm was used in both homicides.

### S. Paul Jackson

{¶ 35} Paul Jackson ("Jackson") testified that he rents out his personal vehicle — a 2020 black Nissan Altima — to others through Turo, a car-sharing app. He testified that he rented this vehicle to Reneshia Jones ("Jones") — Norman's sister and Blackwell's cousin — in April 2023. The vehicle was returned to him the morning of April 8, 2023.

### T. Darnasja Reid

{¶ 36} Darnasja Reid ("Reid") testified that she spoke with Thompson by phone "in the middle of the night," for "about an hour or two" on April 7, 2023. Reid was uncertain as to when the call occurred; she agreed it could have been at 1:00 a.m., 2:00 a.m., or 3:00 a.m. She did not remember hearing another man on the phone and did not recognize Blackwell in the courtroom.

### U. Christopher Thompson

{¶ 37} Thompson testified that, on the evening of April 7, 2023, Blackwell picked him up from a residence. In the car's passenger seat was a man Thompson had never met, who introduced himself as "Cdot." Thompson stated he met with Blackwell so they could sell drugs in Ashtabula. Thompson testified that he had

never been to the Anson Avenue lot prior to April 7, 2023.  Thompson said Blackwell drove to Anson Avenue to pick up drugs.

{¶ 38} After arriving at Anson Avenue, Blackwell and Cdot exited the vehicle. Thompson claimed to have remained in the vehicle, purportedly scrolling Instagram.  Thompson testified, "While I'm scrolling, I hear a lot of gunshots," after which, "I instantly hit the floor of the car."

{¶ 39} When the gunshots stopped, Blackwell and Cdot returned to the vehicle.  Thompson testified that, while reentering the vehicle, Blackwell put a handgun in the car door.  Thompson claimed not to have seen Blackwell exit the car with the gun.  Cdot was holding on his lap a gun smaller than the one Blackwell had returned to the car door.

{¶ 40} Thompson stated that he, Blackwell, and Cdot then drove to Ashtabula to sell drugs, which they did between midnight and 3:00 a.m.  Thompson stated that, while driving to Ashtabula, he made a phone call to a female friend named "Nae."  This call lasted for "about 20 minutes."  Thompson was not aware of Blackwell making any calls while they were in the car together.  Thompson testified that Blackwell and Cdot dropped him off later that night.

{¶ 41} Thompson stated that, on the morning of April 8, 2023, he and Blackwell spoke by phone "about girls, stuff that we seen on Instagram.  Nothing, really."

{¶ 42} Thompson admitted on cross-examination that his testimony differed from his initial statements to police, in which he claimed not to have been

present on Anson Avenue the night of April 7, 2023. Thompson also admitted that he originally told police that he did not know anything about Norman's death. Thompson acknowledged that he did not change his story until a week prior to Blackwell's trial. At that time, Thompson was facing charges including aggravated murder. After Thompson agreed to testify for the State, these charges were reduced to involuntary manslaughter.

{¶ 43} Thompson denied "know[ing] anything" about Cdot and admitted that, despite hearing gunshots and dropping to the car floor, he did not call 9-1-1 on April 7, 2023. Thompson stated that he had one drug contact in Ashtabula, named Jim, but that he did not know his full name, phone number, or with whom he associates in selling drugs.

### V. Stephen Loomis

{¶ 44} Stephen Loomis ("Loomis") testified that he is a detective for the Cleveland Police and that he was the lead investigator of the Nash homicide. Blackwell called Loomis on February 3, 2023; during this call, he denied knowing of Nash's death. Loomis interviewed Blackwell after his arrest. At that point, Blackwell admitted he was aware that Nash had been killed.

### W. Dr. Elizabeth Mooney

{¶ 45} Dr. Elizabeth Mooney ("Mooney") testified that she is a forensic pathologist for the Cuyahoga County Medical Examiner's office. She performed an autopsy of Norman. The autopsy revealed Norman suffered 14 gunshot wounds, most of which traveled from front to back and left to right through his body.

**X. Shane Bauhof**

{¶ 46} Shane Bauhof ("Bauhof") is a homicide detective for the Cleveland Division of Police. Bauhof was the lead investigator of the Norman homicide. On April 7, 2023, he responded to a report of a male victim with multiple gunshot wounds on Anson Avenue. Bauhof spoke with a nearby resident, who shared with police security-camera footage that depicted Norman's white GMC SUV traveling the wrong direction on Anson Avenue at 8:31 p.m. The footage also captured the black Nissan Altima — later associated with Blackwell — as it arrived on Anson Avenue. During his investigation, Bauhof also learned of a video taken by another nearby homeowner and uploaded to the internet that captured audio of gunfire, specifically one shot followed by a volley. Bauhof believed the sound of the gunfire in this video was consistent with the number of bullets and casings found where Norman was shot.

{¶ 47} On April 11, 2023, Bauhof received a report from the National Integrated Ballistic Information Network ("NIBIN") — a database of evidence related to firearm crimes — stating that shell casings collected at Anson Avenue matched casings collected from the scene of Nash's homicide. At this time, Bauhof and Detective Loomis agreed Blackwell was a person of interest in both Nash's and Norman's homicides.

{¶ 48} Because Norman's cell phone was not recovered from the crime scene, Bauhof requested and received Norman's phone records from Verizon. These

records showed that the last phone number Norman's phone contacted was associated with Blackwell.

{¶ 49} Bauhof also learned that the house on the Anson Avenue lot, which was vacant at the time of the homicide, had previously been rented by Jones, Blackwell's cousin.

{¶ 50} Bauhof reviewed a partial extraction of Blackwell's cell phone after U.S. Marshalls confiscated it on April 28, 2023. Bauhof discovered messages between Blackwell and Jones in which Jones asked Blackwell to "give the car back." Bauhof also saw a picture related to a Turo account. This exchange prompted Bauhof to speak to Jackson, who rents his vehicle to others through Turo. Jackson told Bauhof he had rented a black Nissan Altima to Jones, which was returned to him on April 8, 2023.

{¶ 51} Bauhof helped interview Blackwell after he was arrested. Bauhof stated that Blackwell initially denied being present when Norman was shot.

{¶ 52} On cross-examination, Bauhof admitted that he did not seek Instagram records for Cdot because he did not know Cdot's given name. Bauhof also admitted that he did not swab the Nissan for DNA. Bauhof stated this was not done because more than 30 days passed before Cleveland police connected the Nissan to Norman's death, during which time the car was cleaned and used by other people.

**Z. Eshana Shaw**

{¶ 53} Eshana Shaw ("Shaw") testified that she is in a relationship with Blackwell, who stayed with her at an apartment on Woodland Avenue. She stated

that, on April 7, 2023, Blackwell woke up in the apartment.  He left "[m]aybe around 4:30" and returned to the apartment with Thompson and Cdot, where they remained until "[m]aybe 9, 8:00."  Blackwell returned by himself later that night.

{¶ 54} On cross-examination, Shaw admitted she lied to U.S. Marshals who were looking for Blackwell in April when she claimed she had not seen him in nearly a month.

**AA. Malik Blackwell**

{¶ 55} Blackwell testified in his own defense that on January 23, 2023, he helped Bryant move.  Blackwell stated Bryant had previously accused his girlfriend of stealing things, but that Bryant was "leaving the situation alone."  While helping Bryant move, Blackwell met Nash, whom Blackwell understood to be a handyman.  Per Blackwell, Nash made trips to the bathroom to smoke what Blackwell believed, based on smell, to be crack cocaine.  Blackwell recognized this smell from growing up around drug users and sellers in the projects.  Blackwell testified that Nash was acting "weird, just acting aggressive" and that, at some point that day, Nash got on a bus going the wrong direction.

{¶ 56} Blackwell testified that Bryant left the E. 61st Street house, at which point Nash "start[ed] inching up, inching up to me, kept inching up to me."  Per Blackwell, Nash then stood, said, "Family over everything," and "start[ed] attempting to choke me."  Blackwell said that Nash put his hands on Blackwell's neck and applied pressure.  At this time, Blackwell was wearing a hoodie "with the hood up" and testified that, as a result, he did not believe Nash ever actually touched his

skin.  Blackwell said that Nash was four inches taller than he is and felt strong, potentially from drug use and his job as a manual laborer.  In response, Blackwell "was terrified.  It was out of the blue.  I didn't know what was going on."

{¶ 57} Blackwell testified that, at that time, he had on his person a Glock 21, .45-caliber handgun with a binary trigger.  Blackwell "ripped [Nash's] hands away from my neck" and "pushed him over the corner of the couch."  Blackwell testified that Nash "just jumped up" and said, "I'm about to kill you, b----h."  Afterward "he started just coming."  Blackwell stated that he fired two times, after which Nash continued advancing.  Blackwell then fired at Nash until he "went down."

{¶ 58} Blackwell testified that he left the house without calling 9-1-1 because he was scared and did not think anyone would believe his version of events. Blackwell admitted that he changed his story when interviewed by Loomis because he was scared.

{¶ 59} Regarding Norman's death, Blackwell testified that, on April 7, 2023, he drove Cdot and Christopher to Shaw's house in a black Nissan that he rented using Turo.  Blackwell testified that, later, they left to meet Norman at Anson Avenue; Norman needed Blackwell's blender to manufacture drugs.  Blackwell testified that he and Norman were "like brothers."

{¶ 60} Blackwell drove the Nissan to the Anson Avenue lot.  Blackwell entered the house to retrieve the blender, before using the bathroom.  Blackwell testified that, while using the bathroom, he heard music from a car pulling up to the lot.  Blackwell also stated that he had left his gun in the Nissan when he entered the

house and agreed it is common for him to share firearms with associates. Next, Blackwell heard gunfire.

{¶ 61} Exiting the house, Blackwell saw Norman "curled up on the ground in the back of the Nissan." He ran to Norman, flipped him over, smacked his face, and called his name. Blackwell testified that Thompson and Cdot were no longer present. Per Blackwell, Thompson had left his phone in the Nissan. Blackwell stated that they normally share phones. Blackwell testified that he, again, did not call 9-1-1 because he was terrified.

{¶ 62} Eventually, Blackwell drove to Ashtabula to sell drugs. He denied dealing drugs with Thompson to someone named Jim.

{¶ 63} Regarding Nash's death, Blackwell admitted he "know[s] how to fight" but stated he could not fight Nash because of "a damaged shoulder." Blackwell also admitted that he lied to Cleveland Police detectives regarding Norman's death after his arrest because he was scared that Thompson would harm him.

### III. Law and Analysis

#### A. First Assignment of Error — Joinder

{¶ 64} In his first assignment of error, Blackwell asserts that the trial court erred in denying his motion to sever and try separately Counts 1 through 6 (related to the Nash shooting) from Counts 7 through 12 (related to the Norman shooting). We disagree.

{¶ 65} The law favors joinder of multiple offenses in a single trial if the offenses charged "are of the same or similar character." *State v. Torres*, 66 Ohio

St.2d 340, 343 (1981); Crim.R. 13; Crim.R. 8(A).  Joinder is favored because it offers the benefits of "conserving time and expense, diminishing the inconvenience of witnesses and minimizing the possibility of incongruous results in successive trials before different juries." *Id.*  Crim.R. 13 allows two different indictments to be tried together "if the offenses . . . could have been joined in a single indictment or information." Crim.R. 8(A) allows offenses to be joined in a single indictment where they "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan or are part of a course of criminal conduct."

{¶ 66} Crim.R. 14 allows a trial court to sever multiple offenses — try them separately — where joinder would prejudice the defendant or the State.  A defendant moving to sever has the burden of providing the court sufficient information "that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *Torres* at 343.  An appellant "claiming error in the trial court's refusal to allow separate trials of multiple charges has the burden of affirmatively showing that his rights were prejudiced." *Id.*

{¶ 67} The Ohio Supreme Court has recognized that the State may rebut a defendant's claim of prejudicial joinder by showing either 1) the evidence in the joined cases could be introduced in a separate trial as "other acts" evidence under Evid.R. 404(B); or (2) by showing that the evidence as to each crime is simple and direct. *State v. Lott*, 51 Ohio St.3d 160, 163.  *See also State v. T.R.*, 2024-Ohio-3010,

¶ 49 (8th Dist.). Evid.R. 404(B) articulates purposes for which a defendant's prior bad acts may be introduced at trial.

{¶ 68} We review the trial court's decision not to sever the indictments for an abuse of discretion. *Torres*, 66 Ohio St.2d at 343. An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Abdullah v. Johnson*, 2021-Ohio-3304, ¶ 35.

{¶ 69} Blackwell argues the court's decision to try all counts together prejudiced his right to a fair trial. Because Blackwell and Nash were the only two people in the E. 61st Street house during the shooting, Blackwell's only method of establishing that he killed Nash in self-defense was to testify. By testifying about Nash's death, Blackwell also waived his Fifth Amendment right to remain silent regarding the Norman shooting. Had the shootings been tried separately, Blackwell could have avoided testifying and being cross-examined about Norman's death. Per Blackwell, this would have improved his likelihood of success at trial.

{¶ 70} A defendant's desire to testify about one homicide but remain silent about another does not establish that the trial court's joinder of all counts prejudiced his right to a fair trial. The Ohio Supreme Court has stated, "The mere possibility that the defendant might have a better choice of trial tactics if the counts are separated, or the mere possibility that he might desire to testify on one count and not on the other, is insubstantial and speculative; it is not sufficient to show prejudice." *Torres* at 342 (finding that the trial court did not abuse its discretion

denying defendant's motion to sever, where entrapment defense to some counts required defendant to testify about other counts on which he preferred to remain silent). That Blackwell may not have testified regarding the Norman shooting had it been tried separately from the Nash shooting is insufficient to establish that joining all counts was prejudicial.

{¶ 71} We also find that the evidence presented in this case was simple and direct. Blackwell argues that the "risk of jury confusion was high" because the State's case included "testimony of 22 witness over the course of a more than 7 day trial that included hundreds of photos and many hours of multimedia evidence." We agree that Blackwell's trial included a lengthy presentation of evidence; nonetheless, the evidence was simple and direct. The State presented its case in a way unlikely to confuse the jury. With limited exception, witnesses testified in chronological order — first about Nash's homicide, then about Norman's. Further, as Blackwell himself asserts, "besides the video analyst and the firearm examiner, there was no overlap of witnesses or evidence for the two shootings." Because the State's witnesses relating to Nash's homicide were largely distinct from the witnesses of Norman's homicide, it was easy for the jury to understand who was discussing which shooting.

{¶ 72} Even the two overlapping State's witnesses testified and presented evidence in a way that made it easy for the jury to discern one homicide from the other. Video-analyst Piscitello first presented footage from the Nash homicide that tracked the defendant walking through a neighborhood. Piscitello then presented footage regarding the Norman homicide, in which she tracked the movements of a

black Nissan Altima and a white GMC SUV through different neighborhoods. These videos captured different subjects in different places at different times.

{¶ 73} Firearm-examiner Kooser's presentation of evidence was not confusing, either. The key fact Kooser's testimony established is that the same .45-caliber firearm was used in both homicides. On this point, there was nothing for the jury to segregate between the shootings. The State's evidence was simple and direct.

{¶ 74} Lastly, Blackwell argues the court should have tried each shooting separately because the fact that he killed Nash was inadmissible "propensity" evidence that he also killed Norman. Evid.R. 404(B)(1) prohibits "evidence of any other crime, wrong or act" from being used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character." Essentially, Blackwell argues the jury was likely to make an unfair inference that he killed Norman after learning that he killed Nash, which Evid.R. 404(B)(1) prohibits, and separate trials would have avoided.

{¶ 75} However, we find the fact that Blackwell killed Nash was introduced for a permissible purpose regarding Norman's murder. Evid.R. 404(B)(2) allows evidence of prior bad acts to be introduced to prove identity. Blackwell's defense at trial was that someone else shot Norman. Demonstrating that the .45-caliber gun that shot Norman was the same gun Blackwell used to shoot Nash helped the prosecution establish the identity of Norman's shooter. Nash's killing showed that Blackwell had previously used the gun that killed Norman, making it more probable that he was Norman's killer. Evidence that Blackwell killed Nash was permissible

identity evidence under Evid.R. 404(B)(2) regarding Norman's death, meaning there was no need for separate trials.

{¶ 76} Blackwell has not established joinder of all counts was prejudicial. Further, the State has shown its presentation of the evidence was direct and straight forward. Evidence that Blackwell killed Nash using his .45-caliber gun was also admissible identity evidence under Evid.R. 404(B)(2) in the State's case against Blackwell for Norman's murder. The trial court did not abuse its discretion in denying Blackwell's motion to sever certain counts against him. Appellant's first assignment of error is overruled.

### B. Second Assignment of Error — Manifest Weight of the Evidence

{¶ 77} In his second assignment of error, Blackwell argues the manifest weight of the evidence did not support his convictions for aggravated murder. To convict a defendant for aggravated murder, the State must prove the defendant "purposely, and with prior calculation and design, cause[d] the death of another . . . ." R.C. 2903.01(A).

{¶ 78} A manifest-weight-of-the-evidence challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive— the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997). When considering an appellant's claim that a conviction is against the manifest weight of

the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of . . . conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Furthermore, in *State v. Jordan*, 2023-Ohio-3800, ¶ 17, quoting *Thompkins* at 387, the Ohio Supreme Court held that "[s]itting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion."

{¶ 79} In a manifest-weight challenge, the appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility, and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *id.*

{¶ 80} Regarding the Nash shooting, Blackwell does not contest that the State proved the elements of aggravated murder under R.C. 2903.01(A); instead, he argues that the prosecution did not disprove his claim of self-defense. The State may disprove a defendant's self-defense claim by showing that the defendant "(1) was at fault in creating the situation giving rise to the affray; (2) did not have reasonable grounds to believe or an honest belief that he or she was in imminent danger of

bodily harm; or (3) violated a duty to retreat or avoid danger." *State v. Martin*, 2024-Ohio-2172, ¶ 13 (8th Dist.).

{¶ 81} Initially, we note it is undisputed that Blackwell had no duty to retreat or avoid danger. R.C. 2901.09(B) provides that a person has no duty to retreat before using force in self-defense in a place where they have a lawful right to be. The State presented no evidence that Blackwell was unlawfully present at his mother's house on E. 61st Street. Therefore, we find that he had no duty to retreat.

{¶ 82} Blackwell argues that the "the uncontroverted testimony during the trial established that Nash created the situation that led to him being shot." While it is true that Blackwell was the only eyewitness of the shooting able to testify about the events that immediately preceded Nash's death, the jury was free to find his testimony not credible. Ohio courts consistently hold that a jury is "in the best position to assess the credibility of the witnesses who testified at trial" and is free to believe all, part or none of each witnesses' testimony. *State v. Jones*, 2020-Ohio-3367, ¶ 85 (8th Dist.). "The jury was in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony." *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.). The jury could reasonably doubt Blackwell's truthfulness regarding Nash's death because he initially denied knowing about it during a February phone call with Detective Loomis. Blackwell later admitted he had lied to Loomis. That Blackwell's testimony was "uncontroverted" by another eyewitness's does not require the jury to believe his version of events.

{¶ 83} In addition, other testimony and evidence gave the jury reason to doubt that Nash created the situation that led to his death. At trial, Blackwell claimed that Nash attempted to choke him and that, in response, he "ripped [Nash's] hands away from my neck, and . . . pushed him over the corner of the couch. . . ." However, forensic-scientist Esterline testified that she could not identify Blackwell's DNA on Nash's hands, fingernails, neck, or clothing. From this evidence, the jury could reasonably discredit Blackwell's testimony that Nash "just start attempting to choke [him]," initiating a violent altercation. And if the jury disbelieved Blackwell's testimony that Nash attempted to choke him, the jury could also conclude that Blackwell had no reasonable grounds to believe that his life was in danger, a required element of self-defense. Dr. Galita's testimony that four of Nash's ten wounds indicated he was shot from behind also supports the jury's finding that Blackwell did not shoot Nash in self-defense.

{¶ 84} Regarding the Norman shooting, Blackwell does not assert the State failed to prove that someone purposely, and with prior calculation and design, caused Norman's death, as R.C. 2903.01(A) requires. Instead, Blackwell argues the manifest weight of the evidence does not support the conclusion that he was Norman's killer. However, the record included evidence from which the jury could reasonably conclude otherwise. Blackwell does not dispute that he was at the Anson Avenue address at 8:36 p.m. — where and when Norman was shot. Again, it was the jury's prerogative to find his testimony — that he was using the bathroom at the time of the shooting — not credible. The jury would have been justified in doing so

because Blackwell initially lied to investigators that he was not present when Norman was killed. Blackwell admitted at trial these statements were untrue.

{¶ 85} Further, firearm-analyst Kooser testified that the .45-caliber gun used to kill Norman was the same gun with which Blackwell previously shot Nash. The fact that Blackwell had previously used the gun that killed Norman allowed the jury to reasonably identify Blackwell — rather than Cdot, Thompson, or an unknown third person — as the shooter. Thompson's testimony also supports that conclusion. Thompson testified that he heard gunshots after Blackwell exited the Nissan Altima; Blackwell then returned to the car and placed a gun in the driver's-side door. From this evidence, a jury could reasonably determine that Blackwell shot Norman.

{¶ 86} Based on our review of the record, we find the evidence does not weigh heavily against a conviction such that the jury clearly lost its way and created a manifest miscarriage of justice by finding Blackwell guilty on all counts. Appellant's second assignment of error is overruled.

{¶ 87} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

LISA B. FORBES, PRESIDING JUDGE

MARY J. BOYLE, J., and
DEENA R. CALABRESE, J., CONCUR